UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RAMIN NIKOOSERESHT

               Petitioner,

  v.

BEN CURRY, Warden, Correctional Training Facility, Soledad

               Defendant(s).
_____/

No. C 06-04357 MHP

**ORDER GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

      Ramin Nikooseresht ("petitioner"), a state prisoner at the Correctional Training Facility in Soledad, California, brought this petition seeking a writ of habeas corpus pursuant to 28 U.S.C. section 2254 to challenge his denial of parole. His petition is now before the court for review pursuant to 28 U.S.C. section 2243 and Rule 4 of the Rules Governing Section 2254 Cases. Having considered the arguments presented, and for the reasons stated below, the court enters the following memorandum and order.

BACKGROUND

      Petitioner was convicted of second degree murder in violation of California Penal Code section 187. On February 10, 1993, following his conviction, petitioner was sentenced in the San Francisco County Superior Court to fifteen years to life imprisonment. Petitioner does not challenge his conviction but rather the execution of his sentence.

      Petitioner contends that at the time of his conviction his minimum eligible parole date was

February 7, 2003.[1]  At the time he filed his petition, petitioner had served approximately 14.5 years of his sentence, taking into account pre-conviction credit for good behavior and time served. Petitioner contends that he is entitled to five years of additional post-conviction credit under California Code of Regulations, title 15, section 2410.  Thus, petitioner claims to have served more than nineteen years of his sentence.

Petitioner's initial parole consideration hearing took place on May 16, 2002.  The Board of Prison Terms (now known as the Board of Parole Hearings ("BPH")) denied petitioner's request for a duration of two years, stating that "the [commitment] offense was carried out in an especially cruel and callous manner . . . demonstrat[ing] an exceptionally callous disregard for human suffering" and that "[petitioner] still needs to develop and enhance his ability to cope with stress in a nondestructive manner."

The BPH heard petitioner's second request for parole on August 23, 2004.  Petitioner's Life Prisoner Evaluation Report, prepared by a correctional counselor and supported by another correctional counselor, the facility captain and the classification and parole representative, found that petitioner would "pose a low degree of threat to the public," and that he would "have a successful parole."  Although the staff psychologist characterized petitioner as being in "the lowest risk category for community release," the BPH again denied petitioner's request for parole, noting that the commitment crime was committed in an "especially violent and brutal manner," "dispassionate[ly]" and with "a callous disregard for human suffering."  The BPH also claimed that the psychological evaluation was "not totally supportive of release."

The specifics regarding the crime and the circumstances regarding parole suitability are described later in this order and are only mentioned here in brief.  In 1992 petitioner drove from Los Angeles to San Francisco with his 17-year-old girlfriend.  Petitioner claims that after he announced to his girlfriend that he intended to take his own life, she told him that she would rather die than live without him.  That night, petitioner strangled and suffocated the victim with a pillow, then submerged her head in water in the sink in order to ensure that she was dead.  There was also evidence that petitioner had head-butted the victim.  He then bathed her, dressed her, and put her on

2

the bed. Before using a knife to cut his own wrists, petitioner cut one of the victim's wrists in order to find out what would happen when he cut his own. Petitioner passed out from the loss of blood after cutting his wrists but woke up hours later and contacted a friend to call the police.

From the time of his conviction, petitioner has had an exemplary prison record, and his recent psychological evaluations have been strongly supportive of release. When released from prison, he plans to move to Iran, where he as a job offer and a place to live. After exhausting his remedies in the California courts, petitioner filed his federal petition for writ of habeas corpus, contending that the failure of the BPH to find him suitable for parole during his second parole consideration hearing on August 23, 2004 violated his constitutional due process rights. Respondent filed an answer to the court's Order to Show Cause, and petitioner filed a traverse. The matter is now submitted to the court for a decision on the merits.

JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. section 2254. 28 U.S.C. § 1331. Although venue is therefore proper in either the district of confinement or the district of conviction, traditionally California federal courts hear petitions for a writ of habeas corpus in the district of conviction. Laue v. Nelson, 279 F. Supp. 265, 266 (N.D. Cal. 1968) (Weigel, J.). Venue lies in this district because petitioner was convicted in San Francisco County Superior Court.

EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in this petition.

LEGAL STANDARD

I.     Liberty Interest in Parole

The Fifth and Fourteenth Amendments prohibit the government from depriving an inmate of life, liberty, or property without due process of law. U.S. CONST. amends. V, XIV. In the parole context, a violation of an inmate's due process occurs when (1) the inmate has been deprived of a constitutionally protected liberty interest in parole, and (2) the inmate has been denied adequate procedural protections in the parole process. See, e.g., Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003).

There is no cognizable right to parole under the Federal Constitution. The Supreme Court has held, however, that when a state's parole statute uses mandatory language, the statute "creates a presumption that parole release will be granted" unless certain findings are made, and thereby gives rise to a constitutionally protected liberty interest. Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979); Board of Pardons v. Allen, 482 U.S. 369, 377–78 (1987). California Penal Code section 3041 states that "[t]he panel or board shall set a release date unless it determines that" statutorily defined determinations are met. Thus, under Greenholtz and Allen, the Ninth Circuit found "that California's parole scheme gives rise to a cognizable liberty interest in release on parole." McQuillion v. Duncan, 306 F.3d 895, 901 (9th Cir. 2002); see also Sass v. Cal. Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) (holding California inmates have a constitutionally protected liberty interest in parole); Irons v. Carey, 479 F.3d 658, 662 (9th. Cir. 2007).

The second prong of the due process inquiry—whether the inmate has been afforded an adequate parole process—is satisfied if two considerations are met. First, the parole procedure itself must provide an inmate with sufficient safeguards. The inmate must be afforded an opportunity to be heard before an unbiased decision-maker, and in the case of a denial of parole, must be informed of the reasons underlying the decision. See Jancsek v. Or. Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). Second, "some evidence" must support the decision to grant or deny parole. Id.

(adopting the "some evidence" standard established by the Supreme Court in <u>Superintendent v. Hill</u>, 472 U.S. 445, 457 (1985)); <u>see also</u> <u>Irons</u>, 479 F.3d at 662 ("The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to the [liberty] interest if the board's decision is not supported by some evidence in the record or is otherwise arbitrary.") (internal citations omitted); <u>Sass</u>, 461 F.3d at 1128 (holding the some evidence standard applies to parole denials). The evidence underlying the grant or denial of parole must have "some indicia of reliability." <u>McQuillion</u>, 306 F.3d at 904 (quoting <u>Jancsek</u>, 833 F.2d at 1390). <u>Id.</u> The "some evidence" standard applies equally to the board's decision and the Governor's review of the grant or denial of parole. <u>See, e.g.</u>, <u>In re Rosenkrantz</u>, 29 Cal. 4th 616, 656, 660–61 (2003).

II.   <u>Habeas Corpus</u>

The court is required to analyze state habeas claims under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). AEDPA provides that an

> application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1).

Accordingly, this court will review the last reasoned state court opinion under the standards outlined in AEDPA. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991). The Supreme Court has interpreted AEDPA to require a district court to uphold the state court's decision unless that decision was an "objectively unreasonable" application of a clearly established federal law. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003). Here, the last reasoned state court opinion occurred in the California Superior Court for the City and County of San Francisco. Thus, this court will apply the deferential AEDPA standard to the Superior Court proceeding to determine whether it was an "objectively unreasonable" denial of parole.

5

DISCUSSION

I.   Some Evidence Standard

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability hearings. Allen, 482 U.S. at 369; Greenholz, 442 U.S. at 1; Cal. Penal Code § 3041(b). A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Superintendent v. Hill, 472 U.S. at 454–55; Sass, 461 F.3d at 1128–29. Satisfying the some evidence standard "does not require examination of the entire record, independent assessment of witnesses' credibility, or weighing of the evidence, but, instead, the relevant question is whether there is any evidence in the record to support the disciplinary board's conclusion." Hill, 472 U.S. at 455. Although the standard is minimal, it assures that "the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary." Sass, 461 F.3d at 1129 (quoting Hill, 472 U.S. at 457). The some evidence standard is clearly established law in the parole context for the purposes of section 2254(d). Sass, 461 F.3d at 1129.

In order to assess whether the parole board's determination of suitability was supported by some evidence, the court must look to the criteria established by state law. Irons, 479 F.3d at 662. California law dictates that prisoners serving indeterminate sentences for second degree murder may serve up to life in prison but come up for parole consideration one year before the prisoner's minimum eligible release date. In re Dannenberg, 34 Cal. 4th at 1078. Once the prisoner is eligible for parole, the BPH "shall normally set a parole release date . . . in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." Cal. Penal Code § 3041(a). However, an inmate will be denied parole if in the judgment of the BPH the prisoner will pose an unreasonable risk of danger to society if released from prison.[2] A parole date shall be set, however, if the prisoner is found suitable for parole.[3]

The California Supreme Court also has determined that the facts of the crime can alone constitute some evidence and thus support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. In re Dannenberg, 34 Cal. 4th at 1071. However,

6

1  "the Board must point to factors beyond the minimum elements of the crime for which the inmate
2  was committed." Id.; see also Rosenkrantz, 29 Cal. 4th at 682–83 ("A denial of parole based upon
3  the nature of the offense alone might rise to the level of a due process violation—for example where
4  no circumstances of the offense reasonably could be considered more aggravated or violent than the
5  minimum necessary to sustain a conviction for that offense.").

II. Nikooseresht as a Parole Candidate

In determining whether the denial of habeas corpus was supported by some evidence, the court looks to the San Francisco County Superior Court's March 9, 2005 denial of parole as the state's last reasoned decision. Ylst, 501 U.S. at 804. In the March 9, 2005 denial the Superior Court relied on two reasons for the BPH's denial of parole: (1) petitioner's psychological evaluations, which the BPH found to be not totally supportive of release on the grounds that there was insufficient evidence as to petitioner's propensity for aggressive behavior in an intimate heterosexual relationship, and (2) petitioner's commitment offense, which the BPH found to have been carried out in a violent, brutal and dispassionate manner, with a callous disregard for human suffering. Answer, Exh. F at 4–5.

A. Psychological Evaluations

Respondent contends that petitioner's psychological evaluations constitute some evidence indicating unsuitability for parole, as determined by the BPH. The BPH claimed that petitioner's last three psychological evaluations were not totally supportive of release based on risk factors associated with petitioner's potential for aggressive behavior in heterosexual relationships. The BPH cited petitioner's most recent psychological evaluation, dated August 5, 2004, which stated that "[a]lthough inmate has been confined to correctional facilities, with no opportunity for heterosexual relationships available, available psychometric data do not suggest any problems or increased risk factors in this area." Answer, Exh. C at 60. Next, the BPH cited the 2001 evaluation indicating that "it does remain difficult to determine this inmate's propensity for aggressive behavior in intimate

7

heterosexual relationships." Id.  Finally, the BPH referred to the 1996 evaluation, which stated that "it seems likely that the personality factors which contributed to the crime are still a part of [petitioner's] personality make-up." Id.

The validity of the BPH's interpretation of petitioner's psychological evaluation, however, is called into question by the evaluating psychologist himself.  In a letter responding to the BPH's decision, the psychologist who performed the evaluation wrote:

> the writer takes strong exception to a statement made by Presiding Commissioner Risen that the 2004 assessment report is not totally supportive of release. The writer concluded that, 'Risk factors in a community environment are likely no greater than the average citizen. In the absence of any drug or alcohol-related issues, he is an appropriate candidate for parole release consideration, with no recommendation for imposed restrictions.' *It is theoretically impossible to assign a lower risk value to any incarcerated inmate*.

Pet.'s Br., Exh. C at 148 (emphasis added).  The letter further clarified that petitioner's current profile "negates the Board's concern over possible unresolved psychosexual relationship issues." Id. Indeed, contrary to the BPH's characterization, petitioner's psychological evaluations are favorable. Petitioner's 2004 evaluation noted that "Nikooseresht's lack of a juvenile record, absence of mental health issues, and exemplary programming history during his 12 years of incarceration, place him in the lowest risk category for community release." Id. at 150.  Furthermore, petitioner's 2001 evaluation stated that "the bulk of the evidence weighs in favor of his lack of dangerousness ... his violence potential is considered to be no more than the average citizen in the community generally." Id. at 155–56.  Even in the 1996 evaluation, the psychologist stated that "Nikooseresht appears to exhibit true remorse and comes across quite sincere in his regret for participating in the crime." Id. at 159.

Thus, to the extent that the BPH and the Superior Court relied on petitioner's psychological evaluations as constituting some evidence of unsuitability for parole, this reliance was an objectively unreasonable application of clearly established Federal law and does not support a denial of petitioner's application for a writ of habeas corpus. Lockyer, 538 U.S. at 75; 28 U.S.C. § 2254(d)(1).

B.   Commitment Offense

For the Superior Court's decision to stand based solely on the commitment offense, there must be some evidence that the crime was committed in an especially heinous, atrocious or cruel manner under 15 Cal. Code Regs. section 2402(c)(1). In re Rosenkrantz, 29 Cal. 4th. at 682–83. Although this is a deferential standard, the BPH must still point to factors that indicate the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. In re Dannenberg, 34 Cal. 4th at 1071. Furthermore, in order to determine whether such evidence is sufficient, "[t]he test is not whether some evidence supports the *reasons* the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." In re Lee, 143 Cal. App. 4th 1400, 1408 (2006) (emphasis in original). The facts of the crime taken from petitioner's life prisoner evaluation report are as follows:

> Nikooseresht and his 17 year old girlfriend drove from Los Angeles to San Francisco on the afternoon of 04/23/92 . . . Nikooseresht maintained that they were running from her family in Los Angeles because they did not approve of her relationship. He stated that he and the victim had made a suicide pact. Nikooseresht stated that at 1:15 a.m. on 04/25/92, they both decided it was time for him to kill her. He said he strangled, suffocated, slapped and butted her with his head. He then took her to the bathroom and held her head underwater in the sink bowl for four minutes. This was to assure she was dead. He then bathed and dressed the victim. He put her on the bed lying on her back. He made up his mind to cut his wrists so he would die. First he cut the victim's wrist to see what would happen when he cut his wrist. He cut both of his wrists with a knife. These wounds were described in the preliminary hearing as major lacerations. At 4:30 a.m., Nikooseresht called a friend in Los Angeles. He told a friend that he cut his wrists. The police went to the hotel room and found the victim dead and Nikooseresht bleeding from his self-inflicted wounds. He was taken to San Francisco General Hospital for treatment. The coroner's office testified that the victim died from multiple traumatic injuries. Postmortem examination revealed evidence of strangulation and drowning. The cut on her left wrist appeared to have been made postmortem.

Pet.'s Br., Exh. C at 183. Respondent contends that these facts are sufficient evidence under 15 Cal. Code Regs. sections 2402(c)(1)(C) and (D), in that the victim was abused after death and that the offense demonstrates an exceptionally callous disregard for human suffering. Respondent further argues that petitioner's stated motivation of severe depression is inconsistent with petitioner's previous characterization of his crime as a suicide pact, and that this also justified the denial of parole.

9

1    Petitioner has consistently maintained throughout his incarceration that his acts were
2 committed in a state of severe depression and despair and that he loved his girlfriend. It is not
3 inconsistent for petitioner to have stated his intention to take his own life and for a suicide pact
4 subsequently to have been formed. Rather, during his parole hearing petitioner stated that his
5 girlfriend "was dependent on me and I was dependent on her. I mean, she was really at that point of
6 my life, my only reason to live." Answer, Exh. C at 17. This statement is consistent with
7 petitioner's statement that "my main concern was to just get it over with as quickly as possible,
8 because I didn't want her to suffer." Id. Petitioner also stated that the reason he drowned the victim
9 after suffocating her with a pillow was that "I didn't know how to do this. And I just want to make
10 sure that she's gone, that she's not suffering. So I took her to the sink in the bathroom and put her
11 under the water to see if there's any bubbles. All these efforts to make sure that, as I say, she's
12 dead." Id.

13    Respondent contends that the BPH adequately pointed to factors beyond the minimum
14 elements of the crime for which the inmate was committed and that the denial of parole was
15 therefore justified. In re Dannenberg, 34 Cal. 4th at 1071. For this requirement to have any content,
16 however, the facts of the crime must demonstrate callousness and cruelty and suggest that the
17 petitioner remains a danger to public safety. In re Dannenberg, 34 Cal. 4th at 1098. Because second
18 degree murder requires an unlawful killing with malice aforethought, all second degree murders will
19 involve some amount of viciousness or callousness. In re Weider, 145 Cal. App. 4th 570, 587
20 (2006) (stating further that "[t]he nature of human activity is such that, given its subjective
21 assessment, the Board could always find some aspect of the crime that exceeds the minimum
22 elements").

23    This court has seen many egregious murders committed with exceptional brutality and
24 hatred, and this is not one of them. The standard for determining whether a prisoner is unsuitable
25 for parole is determined not by abstractly listing the acts involved in the crime, but rather by asking
26 "whether the crime was committed in a manner that showed exceptionally callous disregard for
27 human *suffering*." In re Weider, 145 Cal. App. 4th at 587 (emphasis in original). The facts of
28

10

petitioner's crime indicate that he did not want the victim to suffer and would have prevented her from suffering, had he known how. Further, cutting the victim's wrist after she was dead did not evidence petitioner's cruelty or malice towards the victim; rather, it was evidence of his ignorance about how to commit suicide. The determination of suitability under California law hinges on whether the prisoner will pose an unreasonable risk of danger to society. 15 Cal. Code Regs. § 2402(a). As such, although petitioner's act of cutting the victim's wrist postmortem technically falls under a section 2402(c) factor indicating unsuitability, it would run contrary to the statutory scheme to consider this act as some evidence of cruelty or malice that would justify the denial of parole. Thus, petitioner's commitment offense cannot by itself constitute some evidence of unsuitability for parole because it fails to establish a basis for determining that petitioner continues to pose an unreasonable risk of danger to society.

### C.     Circumstances Indicating Suitability for Parole

In contrast to the BPH's cited reasons for denying petitioner parole, the factors supporting his release under 15 Cal. Code Regs. section 2402(d) are strong. Petitioner has no juvenile record or criminal history prior to the commission of his commitment offense. Psychological evaluations have indicated the presence of genuine remorse and acceptance of responsibility for the pain and grief he has caused the victim's family. Also, petitioner committed his crime as the result of significant stress related to his family's expectations of him as a young man, and his evaluations indicate that he has matured over his fifteen years in prison and are strongly supportive of release. Furthermore, petitioner's institutional behavior is impeccable: he has remained discipline free during his incarceration, maintained an excellent work record, obtained marketable skills in a range of vocations and completed an array of self-help programs available to him in prison. Finally, petitioner plans to leave the country for Iran upon release. As the BPH found, petitioner has viable parole plans in Iran upon release, including a job offer and a place to live in Iran, as well as the support of his family.

### III. Biased Decision-Maker Claim

Due process dictates that a decision-maker determining a prisoner's parole date be unbiased. O'Bremski v. Maas, 915 F.2d 418, 422 (9th Cir. 1990) (an inmate is "entitled to have his release date considered by a Board that [is] free from bias or prejudice."); see also Withrow v. Larkin, 421 U.S. 35, 47 (1975) ("Not only is a biased decision-maker constitutionally unacceptable but 'our system of law has always endeavored to prevent even the probability of unfairness.'" (quoting In re Murchison, 349 U.S. 133, 136 (1955)). Petitioner asserts that Governors Wilson and Davis had a blanket no-parole policy in violation of due process.  However, this claim fails for a lack of evidentiary support, as petitioner has not provided sufficient evidence to support his allegations that he was denied individualized, unbiased consideration.  Petitioner's request for an evidentiary hearing to evaluate the Board's policies is also denied.

### IV. Substantial Evidence Claim

Petitioner asserts again that a "substantial evidence" standard is correct despite the court having dismissed this claim without leave to amend in its October 30, 2006 Order to Show Cause. Both this court and the U.S. Supreme Court have been clear that a reviewing court must find that there was some evidence, not substantial evidence, to support the conclusions of the disciplinary board. Superintendent v. Hill 472 U.S. at 455–56.

### V. Fact Finding Process

Petitioner argues that the state court fact finding process is invalid under Apprendi v. New Jersey, 530 U.S. 466 (2000) and Blakley v. Washington, 542 U.S. 296 (2004), arguing that a judge may not deny parole based on facts not found by a jury or admitted by a defendant.  Petitioner's premise for this argument seems to be that a life sentence is not the maximum term of a sentence of fifteen years to life. Although Apprendi held that any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, where the statutory maximum is life in prison, Apprendi does not apply.  Apprendi, 530 U.S. at 490.  Furthermore, Blakely specifically held

that <u>Apprendi</u> does not invalidate indeterminate sentencing schemes.  <u>Blakely</u>, 542 U.S. at 308. Thus, petitioner's argument in this regard also fails.

CONCLUSION

For the foregoing reasons the petition for writ of habeas corpus is GRANTED.  Within thirty (30) days of the date of this order the Board of Parole Hearings must calculate a term for Nikooseresht and set a date for his release in keeping with this order and in accordance with the requirements of California Penal Code section 3041(a).  Within forty (40) days of the date of this order, respondent must file and serve a notice of the date set for Nikooseresht's release.

IT IS SO ORDERED.

Dated: July 17, 2007

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

# **ENDNOTES**

1. This appears to be in error, as the record shows that petitioner was first eligible for parole on April 25, 2002.

2. The listed circumstances tending to show unsuitability for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner has previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).

3. The listed circumstances tending to show suitability for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered women's syndrome, lack of criminal history, the present age reducing the probability of recidivism, whether the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs § 2402(d).